FILED
DECEMBER 1, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ABDULLATIF ARISHI, | ) | No. 33306-0-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| WASHINGTON STATE UNIVERSITY, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Abdullatif Arishi challenges his expulsion from Washington State University's (WSU's) doctoral program in Education, claiming the university failed to afford him a full adjudicative proceeding required by the Washington Administrative Procedure Act, chapter 34.05 RCW (APA).

The APA provides for only two types of adjudication: a presumptive full adjudicative process that requires a hearing with some procedural guarantees, and a simplified process that does not. The APA does not authorize agencies to adopt processes that fall somewhere in between. While this does not prevent agencies from offering more procedural protections than are required in the simplified process, it does

mean that to determine whether full adjudication is warranted, the alternatives weighed

are statutory brief adjudication and full adjudication, not some in-between process that an

agency is willing to make available.[1]

The statutory brief adjudication procedure is inadequate where a college or

graduate student faces expulsion or is charged with sexual misconduct that would amount

to a felony under criminal law. For that reason, and because Mr. Arishi has demonstrated

substantial prejudice, we reverse the superior court and the underlying agency order,

award Mr. Arishi reasonable attorney fees, and remand for a full adjudication.

## LEGAL BACKGROUND

It is helpful to start with the legal framework in which Washington colleges and

universities adopt student disciplinary procedures. Washington colleges and universities

are "agencies" and are subject to the APA, as are the "divisions, departments, or offices"

that act on their behalf. RCW 34.05.010(2), (7).

The current version of the APA was enacted in 1988. LAWS OF 1988, ch. 288, §

18. The task force that worked on revising Washington's then-existing act used the

Model State Administrative Procedure Act (Model Act, 15 U.L.A. 1 (2000)), published in

1981 by the National Conference of Commissioners on Uniform State Laws "as a check

---

[1] Additional procedural protections provided in a simplified adjudication might affect whether a party petitioning for review of an administrative decision was prejudiced, as discussed *infra* in Section V.

2

list of relevant issues." William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 782 (1989). The task force undertook "a systematic comparison of the Model Act with the existing Washington act." *Id.*

The Model Act provides for what it calls a "formal" hearing process, which is the presumptive procedure to be used in nonemergency, nondeclaratory adjudicative proceedings. Model Act § 4-201 cmt., 15 U.L.A. at 76. Among procedures required in formal adjudications are the right to be advised and represented by counsel, *id.* § 4-203 at 81; a reasonable notice of hearing that includes prescribed minimal contents, *id.* § 4-206 at 84-85; a presiding officer with authority to issue subpoenas, discovery orders, and protective orders, *id.* § 4-210 at 88; the opportunity to present evidence and conduct cross-examination, *id.* § 4-211(2) at 89; the requirement that witnesses testify under oath and the right to object to evidence (with an exception for hearsay), *id.* § 4-212 at 90-91; and the entry of sufficient written findings that must be supported by "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their serious affairs," *id.* § 4-215(d) at 95.

Washington lawmakers provided in the APA for a similar presumptive procedure for nonemergency, nondeclaratory adjudications. RCW 34.05.410(1) ("Adjudicative proceedings are governed by RCW 34.05.413 through 34.05.476 except as otherwise provided."). They did not call Washington's presumptive procedure "formal

3

adjudication," so we will refer to it as "full" adjudication. Full adjudication in

Washington includes the following procedures summarized by Professor Andersen:

> At the hearing, a party is entitled to appear in person and to be advised and represented by counsel. The new Act makes no significant change in the rules of evidence in adjudications, although there is a provision referring the presiding officer to the Washington Rules of Evidence "as guidelines for evidentiary rulings" where the Act itself is silent. Parties are entitled to respond, to present evidence ("good" hearsay evidence is explicitly made admissible), and to conduct such cross examination as is "necessary for full disclosure of all relevant facts and issues."

Andersen, *supra*, at 810-11 (footnotes omitted). In these and other respects,

Washington's full adjudication is similar and in some cases identical to formal

adjudication under the Model Act.[2] In a few instances, full adjudication provides more

rights and protections to respondents than does formal adjudication under the Model Act.

*E.g.*, RCW 34.05.446(1) (authorizing attorneys for parties to issue subpoenas); RCW

34.05.461(4) (providing that a presiding officer's findings shall not be based exclusively

---

[2] *Compare* RCW 34.05.428 (permitting a party to appear in person and be advised and represented by counsel) *with* Model Act § 4-203; *compare* RCW 34.05.434 (providing for at least seven days' advance written notice of hearing, with prescribed minimal contents) *with* Model Act § 4-206; *compare* RCW 34.05.446 (authorizing the presiding officer to issue subpoenas and protective orders and providing that "[a] subpoena may be issued with like effect by the agency or attorney of record in whose behalf the witness is required to appear") *with* Model Act § 4-210; *compare* RCW 34.05.449(2) (the opportunity to present evidence and conduct cross-examination) *with* Model Act § 4-211(2); *compare* RCW 34.05.452 (the right to object to evidence and requiring that witnesses testify under oath) *with* Model Act § 4-212; *compare* RCW 34.05.461 (requiring the entry of sufficient written findings that must be supported by "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs") *with* Model Act § 4-215(d).

4

on inadmissible evidence "unless the presiding officer determines that doing so would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence").

Both the Model Act and the APA identify exceptional adjudications that can be resolved using simplified procedures. The Model Act provides for two types of informal, nonemergency adjudications: "conference adjudication" and "summary adjudication." "Conference adjudication" is described by comments to the Model Act as a "'peeled down' version of the formal adjudicative hearing" used in "relatively minor" matters. Model Act § 4-402 cmt., § 4-401 cmt., 15 U.L.A. at 109, 107-08. It may be used in the following categories of matters:[3]

(1) a matter in which there is no disputed issue of material fact; or

(2) a matter in which there is a disputed issue of material fact, if the matter involves only:

(i) a monetary amount of not more than [$1,000];

(ii) a disciplinary sanction against a prisoner;

(iii) **a disciplinary sanction against a student which does not involve expulsion from an academic institution or suspension for more than [10] days;**

(iv) a disciplinary sanction against a public employee which does not involve discharge from employment or suspension for more than [10] days;

---

[3] The Model Act further provides that use of the conference hearing procedure may be used only if "its use in the circumstances does not violate any provision of law and the matter is entirely within one or more categories for which the agency by rule ha[s] adopted" such hearings. Model Act § 4-401.

5

No. 33306-0-III
*Arishi v. Wash. State Univ.*

> > (v) a disciplinary sanction against a licensee which does not involve revocation, suspension, annulment, withdrawal, or amendment of a license; or
> >
> > (vi) . . ..]

Model Act § 4-401 (emphasis added) (alterations in original).

The even more peeled-down "summary adjudication" procedure provided by the Model Act may be used in matters in which there *are* disputed facts, but that are even less consequential.[4] Among eight categories of matters eligible for summary adjudication under the Model Act are several relevant here: matters that present "a monetary amount of not more than [$100]," **"a reprimand, warning, disciplinary report, or other purely verbal sanction without continuing impact against a . . . student,"** or "any matter having only trivial potential impact upon the affected parties." Model Act § 4-502(3)(i), (ii), and (viii) (emphasis added) (alteration in original).

Washington lawmakers also created a simplified procedure that can be used in some cases. But they departed from the Model Act's approach. Rather than provide for conference or summary adjudication, Washington legislators provided for a single type of simplified hearing that they called a "brief adjudicative proceeding." Under RCW 34.05.485 through 34.05.494 such a proceeding may be limited to the presiding officer

---

[4] Here, too, use of the simplified procedure must not violate any provision of law and the matter must be entirely within a category for which the agency has adopted summary adjudications. Model Act § 4-502(1) and (3). In addition, it may be used only if "the protection of the public interest does not require the agency to give notice and an opportunity to participate to persons other than the parties." Model Act § 4-502(2).

6

- giving each party an opportunity to be informed of the agency's view of the matter and to respond with the party's view, RCW 34.05.485(1)-(2);

- maintaining a record consisting of any documents regarding the matter that the presiding officer considered or prepared, RCW 34.05.494(1); and

- delivering an "initial order" to the parties within 10 days, consisting of a brief written statement of reasons for the presiding officer's decision and information about any internal administrative review available, RCW 34.05.485(3)-(4).

Four conditions must exist for an agency to use brief rather than full adjudication.

Brief adjudication may be used if:

> (a) The use of those proceedings in the circumstances does not violate any provision of law;
> (b) The protection of the public interest does not require the agency to give notice and an opportunity to participate to persons other than the parties;
> (c) The matter is entirely within one or more categories for which the agency by rule has adopted this section and RCW 34.05.485 through 34.05.494; and
> (d) The issue and interests involved in the controversy do not warrant use of the procedures of RCW 34.05.413 through 34.05.479.

RCW 34.05.482(1). RCW 34.05.482(2) explicitly disallows use of brief adjudication for

"public assistance and food stamp or benefit programs provided for in Title 74 RCW,

including but not limited to public assistance as defined in RCW 74.04.005(1)."

(Reviser's note omitted.) According to Professor Andersen, "Concern about the quality

of informal hearings in the welfare area led the legislature to prohibit their use in certain

welfare proceedings." Andersen, *supra*, at 818.

Thirty-nine Washington colleges and universities have adopted administrative

regulations published in the Washington Administrative Code (WAC). As demonstrated

7

by a summary included as an appendix, their provisions for the conduct of student disciplinary proceedings vary, including on the issue of whether and when students being disciplined by their college or university have a right to a full adjudication. As illustrated by the appendix, the University of Washington and 11 other Washington colleges or universities would have conducted or allowed a full adjudication in this case.

FACTS AND PROCEDURE

In the spring semester of 2014, Abdullatif Arishi, then a Ph.D. graduate student at WSU, was charged by the Whitman County prosecutor with the third-degree rape and molestation of a 15-year-old girl. Mr. Arishi's relationship with the minor came to the attention of a state trooper who responded to the scene of a car accident in which the 15-year-old, identified in court filings as "MOS," rear-ended another car. Clerk's Papers (CP) at 100-01. She did not have a driver's license or a learner's permit. The car she was driving belonged to Mr. Arishi, who she knew as "Alex," and who was her passenger. CP at 100.

Several facts that came to the trooper's attention caused him concern about the Arishi-MOS relationship. Mr. Arishi was 40 years old. MOS's mother, who the trooper contacted, had no idea that MOS was not at home, or that she was with a 40-year-old man. At the time of the accident, MOS, whose mother had pulled her out of school over bullying issues, was supposed to be working on her studies at home.

8

Since MOS lived in Pullman, the trooper contacted the Pullman police department upon completing his response to the accident and passed along his concerns. The matter was assigned to Detective Todd Dow.

Detective Dow promptly called the hospital where MOS was being treated for minor injuries and spoke with MOS's mother. The mother was aware MOS had been spending time with someone named Alex for several weeks and she believed they had been communicating for approximately two months. MOS had described Alex to her mother as "a college kid or something like that," and as "18 to 19 years [old]." CP at 239, 49. MOS's mother told the detective she had learned recently that Alex paid some of MOS's cell phone bills and had given her money. She was aware that the day before the accident, Alex bought MOS a cell phone. She did not know the extent of the sexual activity between MOS and Alex. She only learned on the day of MOS's auto accident that Alex was actually 40 years old, that MOS had not spent the day studying at home like she was supposed to, and that Alex had offered to give MOS a car.

At Detective Dow's request, the mother had MOS contact him, and Detective Dow interviewed MOS twice. MOS told the detective she met Mr. Arishi a couple of months earlier on a dating website called "Badoo." CP at 100. Asked to describe her relationship with Mr. Arishi, MOS told the detective she didn't really feel like she and Mr. Arishi were "'together,'" but she "[didn't] know if he sees it the same way." CP at 50. She said Mr. Arishi spoke of her as "his 'girlfriend.'" *Id.* She claimed she revealed

9

to Mr. Arishi that she was only 15 and he told her women in his country get married when they are 16. Asked about her sexual contact with Mr. Arishi, MOS told the detective that the first time she met Mr. Arishi he tried having sex with her, but they did not. According to the detective's report, "She said that she didn't remember anything else from the first time she saw him." CP at 51. She told him that on a later occasion, Mr. Arishi asked her to perform oral sex on him and she declined, although she did briefly touch his genitals. Finally, she told the detective that on the day of the accident, Mr. Arishi touched her breast and thigh on top of her clothing as she was driving his car.

When Detective Dow realized the sexual contact MOS described had all taken place in a car in Colfax, he referred the matter to the Whitman County Sheriff's Department, where it was assigned to Sergeant Chris Chapman. According to a summary of probable cause completed by Sergeant Chapman, MOS told him that the first time she was with Mr. Arishi, he touched her vagina and anus and digitally penetrated her.

Mr. Arishi pleaded not guilty to the charges filed against him in Whitman County. The statutes under which he was charged are based on sexual contact with someone under the age of consent, which in Washington is 16. It is a defense to the crimes, and a defense Mr. Arishi asserted in the criminal case, that at the time of the offense he "reasonably believed the alleged victim to be [at least 16] based upon declarations as to age by the alleged victim." RCW 9A.44.030(2).

10

Upon learning of Mr. Arishi's arrest, WSU notified him it was charging him with violating WSU's standards of student conduct and its Policy Prohibiting Discrimination, Sexual Harassment, and Sexual Misconduct, and was suspending his attendance and denying him access to campus, effective immediately. It notified him he should contact the dean of students to discuss a hearing of the student conduct board that would be convened in the near future.

WSU's administrative regulations include WAC 504-04-010, which provides that student conduct proceedings, without exception, "are matters to be treated as brief adjudications pursuant to RCW 34.05.482 through 34.05.491." WSU's only regulation addressing the possibility of a full adjudication for a student appears at WAC 504-26-407(1)(c) and (6)(b); it provides that after a student conduct hearing, an aggrieved student may appeal, in which event any appeals board convened, or the president, or the president's designee, "shall make any inquiries necessary to ascertain whether the proceeding must be converted to a formal adjudicative hearing under the Administrative Procedure Act."

Despite WSU's rules denying him a full adjudication, Mr. Arishi requested one, contending the "issues and interests involved" warranted the presumptive APA procedure. CP at 167. His request was denied.[5]

---

[5] WSU's lawyer was asked at oral argument of the appeal whether WSU has ever found that a disciplinary action required a full adjudication. To her knowledge, it never

11

In a one-hour student conduct hearing conducted on May 21, 2014, the director of WSU's Office of Student Standards and Accountability presented the charges against Mr. Arishi. Under the university's student conduct procedure, the rules of evidence were not applied, only board members could question witnesses, proposed student questions had to be submitted in writing to a board member who would decide whether or not to ask them, and Mr. Arishi had no opportunity to subpoena witnesses or documents. Mr. Arishi attended the hearing with the lawyer representing him in his pending criminal case, but pursuant to student conduct rules, the lawyer could act only as a private advisor and could not address witnesses or the conduct board.

WSU called two witnesses. The first was Kimberly Anderson, the director of WSU's Office for Equal Opportunity. She testified that she investigated the allegations against Mr. Arishi by speaking to a deputy prosecutor and obtaining Whitman County's probable cause affidavit, police report, and other documents in Mr. Arishi's criminal case; by interviewing Detective Dow; and by interviewing Sergeant Chapman. She testified she had also attempted to interview Mr. Arishi. He and his criminal defense lawyer met with her and presented a general denial, but given the pending prosecution and United States Constitutional Fifth Amendment concerns, Mr. Arishi refused to

---

has. Washington Court of Appeals oral argument, *Arishi v. Wash. State Univ.*, No. 33306-0-III (Apr. 28, 2016) at 15 min., 41 sec. through 16 min., 14 sec. (on file with the court).

answer specific questions. Asked whether she made any attempts to contact the alleged victim, Ms. Anderson suggested she had, through the deputy prosecutor, "and thus far she has declined to be interviewed." CP at 228.[6]

Because she had not spoken with the victim or been able to question Mr. Arishi, Ms. Anderson told the conduct board that her office "had to rely on the assessment of the two police, or the police and the deputy," adding:

> [W]e did question them, you know, sort of at length about their assessment, why they made that assessment, kind of applying the similar process that we would apply had we interviewed directly, and found that that was sufficient for us.

CP at 228. In her investigation report admitted into evidence, she asserted that both Detective Dow and Sergeant Chapman described MOS as credible.

WSU's second witness at the conduct hearing was Detective Dow, who testified to his interviews of MOS. He was not asked if he found MOS to be credible and did not volunteer an opinion on that score. Asked whether MOS "seem[ed] real mature for her age?", the detective responded, "[t]he face" looks young. CP at 242. Questioned further, he said, "She's, I guess, fully physically developed. She doesn't have a young body in terms of, but her face does look—I don't know how do you describe that?" CP at 245.

---

[6] The agency record contains two e-mails from Ms. Anderson to Deputy Prosecutor Merritt Decker. In the e-mails, Ms. Anderson provides her contact information and conveys an invitation that MOS may contact her. She does not express a desire to interview MOS or request that opportunity. *See* CP at 67, 104.

13

Mr. Arishi did not testify but did submit a sworn written statement. It set forth

what it stated was "a true and accurate quote of the Badoo website's terms of use,"

including:

> Who can use Badoo? Badoo is a meeting place for adults. You may only use and become a registered member of Badoo if you are 18 years old or older, or the age of majority in the country in which you reside, if that happens to be greater than 18.
>
> You warrant that you have the right, authority, and capacity to enter into and be bound by the terms and that by using Badoo, you will not be violating any law or regulation of the country in which you are a resident.

CP at 247. Mr. Arishi's statement went on to say, "[T]he young woman in this case, user

name for her Badoo profile, was Panda. Her profile represented that she was 19 years of

age." CP at 248.

When given the chance to make a closing statement, Mr. Arishi told the board he

had started WSU's doctoral program three years earlier, in the spring of 2011, and was

one semester away from getting his Ph.D.

In a written decision dated May 23, 2014, the conduct board found Mr. Arishi

responsible for all violations charged by WSU. It expelled him and trespassed him from

the WSU campus until January 1, 2020. While finding that MOS had registered as

"Panda" on the Badoo website as a 19-year-old woman, and that "it is quite possible that

when you conversed with her on line that you did think that she was an adult," it

nonetheless found, "[t]he circumstances were such that once you met her face to face you

knew that she was too young." CP at 41.

14

Mr. Arishi appealed the conduct board's order to WSU's appeals board, arguing the procedures had not been adequate to protect his interests and the decision was not supported by substantial evidence. He also renewed his request for a full adjudication. The appeals board affirmed the conduct board's order and denied the request for a full adjudication, stating that following review, it determined that converting the matter to a full adjudication "was not necessary." CP at 16. The appeals board's decision was reviewed by WSU's president, who found no reason to intervene.

Mr. Arishi petitioned for judicial review by the Whitman County Superior Court, which affirmed WSU's decision.

Mr. Arishi appeals. At oral argument of the appeal, Mr. Arishi's lawyer made an unchallenged representation that Mr. Arishi's expulsion from WSU led to loss of his student visa, he had returned to Saudi Arabia, and he had been unable to obtain admittance to any other graduate program in the United States to complete his doctoral studies. Washington Court of Appeals oral argument, *Arishi v. Wash. State Univ.*, No. 33306-0-III (Apr. 28, 2016) at 35 min., 40 sec. through 35 min., 55 sec. (on file with the court).

## ANALYSIS

The APA governs judicial review of an agency action. *Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 413, 216 P.3d 451 (2009). Of the nine statutory bases on which an agency order can be reversed, Mr. Arishi argues five

15

support reversal here: (1) the agency engaged in an unlawful procedure or decision-making process, or failed to follow a prescribed procedure, (2) the agency erroneously interpreted or applied the law, (3) the agency did not decide all issues requiring resolution by the agency, (4) the agency issued an order inconsistent with its own rule, or (5) the agency issued an order that is arbitrary or capricious. RCW 34.05.570(3) (c), (d), (f), (h), and (i).

In reviewing agency action, we stand in the same position as the superior court and review the administrative record rather than the superior court's findings or conclusions. *Edelman v. State*, 160 Wn. App. 294, 303, 248 P.3d 581 (2011). We "view the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority." *Schofield v. Spokane County*, 96 Wn. App. 581, 586, 980 P.2d 277 (1999). Mr. Arishi bears the burden of showing invalid action. RCW 34.05.570(1)(a). Relief is available only if he shows he was substantially prejudiced by the action complained of. RCW 34.05.570(1)(d). In the context of judicial review of an agency action, we may review the validity of a relevant agency rule. RCW 34.05.570(2)(a).

No Washington decision has construed RCW 34.05.482(1)(d) to determine what issues and interests warrant use of full adjudication. As always, our purpose in construing the statute is "'to determine and give effect to the intent of the legislature.'" *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013) (quoting *State v. Sweany*, 174

16

Wn.2d 909, 914, 281 P.3d 305 (2012)). We derive that intent solely from the plain language used by the language when possible. *See id.*

Although Mr. Arishi identifies five statutory bases for challenging WSU's final order, we find two to be dispositive: WSU engaged in an unlawful decision-making process and erroneously applied the law. RCW 34.05.570(3)(c) and (d). Both of those challenges present issues of law that we review de novo. *Darkenwald v. Emp. Sec. Dep't*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

### *I. An agency may not substitute brief adjudication for the presumptively-required full adjudication unless all of the conditions of RCW 34.05.482 are satisfied*

RCW 34.05.482(1)(c) plainly requires agencies who wish to use brief adjudication to adopt a rule identifying the categories of matters for which it adopts the simplified procedures provided by RCW 34.05.485 through 34.05.494. WSU adopted WAC 504-04-010, identifying seven categories of matters that would be handled by brief adjudication, including "[s]tudent conduct proceedings." WAC 504-04-010(1).

RCW 34.05.482(1)(d) identifies an independent and equally important condition that must apply before an agency uses brief adjudication: it cannot use the simplified procedure if the issue and interests involved in a controversy warrant use of the full adjudication procedures provided by RCW 34.05.413 through .479. Presumably, that requirement will be given consideration when an agency identifies the matters for which it adopts brief adjudication. But if an agency adopts brief adjudication for a type of

17

matter that ultimately warrants full adjudication, the subsection (d) condition cannot be ignored simply because the subsection (c) condition was satisfied.

Where full adjudication is warranted, an agency's rule that mandates brief adjudication for that category of matter without allowing for exceptions is not adopted "in accordance with the standards provided in RCW 34.05.482." RCW 34.05.410(1)(a). In that event, the adjudication proceeding is "governed by RCW 34.05.413 through 34.05.476": the procedures for full adjudication. RCW 34.05.410.

*II. Case law informs the meaning of the statutory mandate that brief adjudication may not be used if the issue and interests involved warrant use of full adjudication*

"Issue" and "interests" as used in the expression "issue and interests involved in the controversy do not warrant [full adjudication]", RCW 34.05.482(1)(d), have a plain meaning in the context of a dispute requiring adjudication. "Issue," in that context, means "a point in question of law or fact; *specif:* a single natural point of law or fact depending in a suit that is affirmed by one side and denied by the other and that is presented for determination at the conclusion of the pleadings." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1201 (1993). "Interest" means "[T]he state of being concerned or affected esp. with respect to advantage or well-being : GOOD, BENEFIT, PROFIT <engaged a lawyer to look after his ~s> <acting always in his own ~> <each faction made concessions in the common ~> <speed laws passed in the ~ of safety>." *Id.* at 1178.

18

Why and when issues and interests warrant use of full adjudication is somewhat less clear. The parties implicitly agree that decisions of the United States Supreme Court construing the minimum requirements of due process inform how issues and interests might warrant use of a formal process. *Cf. State v. Roggenkamp*, 153 Wn.2d 614, 621, 106 P.3d 196, *aff'd*, 153 Wn.2d 614 (2005) (relevant case law may provide guidance in construing the meaning of an ambiguous statute). As observed by a leading treatise, due process jurisprudence not only influences legislatures drafting procedural provisions but also—because of its relevance to legislators—influences the construction of procedural provisions by the courts. 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 9.1, at 559-60 (4th ed. 2002). Legislatures "can, of course, choose procedures more demanding than those dictated by due process, but their choice of procedures is influenced heavily by their beliefs concerning the procedures required by due process." *Id.* at 560.

Several decisions of the United States Supreme Court beginning in the 1970s are particularly influential. In *Goldberg v. Kelly*, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287, (1970), the Court held that the nature of a decision to terminate public assistance (welfare) benefits was such that most elements of a trial-type hearing should be made available before termination. "[T]ermination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits." *Id.* at 264 (emphasis omitted). The trial-type elements required included

19

timely and adequate notice detailing reasons for agency action and "an effective opportunity to defend by confronting any adverse witnesses and by presenting [the recipient's] own arguments and evidence orally." *Id.* at 268. Those trial-like elements are important where a case presents a risk of termination "resting on incorrect or misleading factual premises." *Id.* "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.* at 269.

The Court also held that a recipient at risk of termination of welfare benefits "must be allowed to retain an attorney if he so desires," for reasons the Court described:

> Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient. We do not anticipate that this assistance will unduly prolong or otherwise encumber the hearing.

*Id.* at 270-71.

In 1975, the Court addressed the minimum due process owed public high school students temporarily suspended from school (for 10 days or less) in *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975). It held that the timing and content of notice and "the nature of the hearing . . . depend on appropriate accommodation of the competing interests involved." *Id.* at 579. It described the students' interest in temporary suspension cases as "to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id.* It also pointed to its earlier recognition that

20

individuals have an interest in receiving notice and being heard "'[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.'" *Id.* at 574 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971)).

The Court recognized that "the length and consequent severity of a deprivation" was a "factor to weigh in determining the appropriate form of hearing," and that "[a] short suspension is . . . a far milder deprivation than expulsion." *Id.* at 576. Weighing the interest of elementary and secondary students in "[e]vents calling for discipline" which it characterized as "frequent occurrences," the Court held that in connection with a suspension of 10 days or less, it sufficed that the student "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 580-81.

In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the Court characterized its prior decisions as indicating that the specific dictates of due process in a given case

> generally requires consideration of three distinct factors: first, the private
> interest that will be affected by the official action; second, the risk of an
> erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards;
> and finally, the Government's interest, including the function involved and
> the fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

21

*Mathews* involved agency terminations of disability benefits and whether they required the same pretermination protections as the welfare benefits involved in *Goldberg*. As to the first factor, the private interest affected, the court held that "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process." *Id.* at 341. Although the hardship imposed upon an erroneously terminated disability recipient "may be significant," it was likely less so than erroneous termination of welfare benefits, since a disabled recipient may have private resources or be eligible for other government assistance. *Id.* at 342.

As to the second factor, the risk of error and value of procedural safeguards, the Court considered the nature of the most frequently disputed issues of fact and the character of evidence presented in different sorts of cases. It distinguished termination of disability benefit decisions from those involving welfare recipients, pointing out that disability determinations are made in reliance on what are in most cases "'routine, standard, and unbiased medical reports by physician specialists.'" *Id.* at 344 (quoting *Richardson v. Perales*, 402 U.S. 389, 404, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). By contrast, in welfare termination cases, "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical." *Id.* at 343-44. Oral evidence and cross-examination are more important safeguards of accuracy in the latter type of case.

22

As to the third factor—the government's interest—the Court characterized the required inquiry as not "[f]inancial cost alone," but rather, "[a]t [what] point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Id.* at 348.

Finally, *Board of Curators v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978) involved the due process required when a graduate student is dismissed from a public university for academic deficiencies. The Court distinguished the risk of error and value of procedural safeguards when a school makes academic decisions from the risk and value when it makes decisions about disciplining a student for misconduct. "[F]ar less stringent procedural requirements" are called for in the case of an academic dismissal. *Id.* at 86.

> "Misconduct is a very different matter from failure to attain a standard of excellence in studies. A determination as to the fact involves investigation of a quite different kind. A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship."

*Id.* at 87 (quoting *Barnard v. Inhabitants of Shelburne*, 216 Mass. 19, 102 N.E. 1095 (1913)). By contrast, "[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90. *Cf. Ritter v. Bd. of Comm'rs of Adams County Pub. Hosp. Dist. No. 1*, 96 Wn.2d 503,

511, 637 P.2d 940 (1981) (the risk of a hospital's unjustified suspension of physician for quality assurance reasons is small when its board has worked closely with the physician for years).

In enacting the APA in 1988, the legislature acted consistently with *Goldberg* when it provided that brief adjudication was not authorized for public assistance and food stamp or benefit programs. RCW 34.05.482(2). We conclude that in providing that issues and interests might warrant full adjudication, it likewise had the United States Supreme Court's due process jurisprudence in mind. We construe RCW 34.05.482(1)(d) accordingly.

An issue may warrant full adjudication where the nature of disputed facts and character of the relevant evidence make the trial-like elements of full adjudication valuable safeguards against the risk of an erroneous deprivation.

Private interests may warrant full adjudication where the severity of a deprivation—its length, a resulting stigma, or its impact on a person's life or liberty—justify additional safeguards for the individual affected.

The interests of the agency must also be considered, not in terms of financial cost alone, but in terms of whether the cost or relative burden to the agency of full adjudication outweighs the importance of additional procedural safeguards.

24

### *III.   At issue is whether the brief adjudication procedures set forth in RCW 34.05.485-.494 are adequate in this case*

Having construed the APA to plainly require full adjudication when the issue and interests warrant it, and having construed the issues and interests that must be considered, one disputed issue remains: what alternative procedures are to be compared. The APA plainly provides that the determination involves consideration of the only two types of adjudication provided by the APA, which are full adjudication and statutory brief adjudication.

WSU errs in assuming that our task in this case is to decide whether a hybrid process that it has adopted and that it used in Mr. Arishi's case meets the minimum requirements of constitutional due process.[7] Mr. Arishi does not contend that full adjudication was constitutionally required: he argues it was statutorily required. As Professor Pierce points out, "Courts invoke the Due Process Clause to determine the procedures an agency must use to make a decision in only a tiny fraction of the millions of proceedings agencies conduct each year." 2 PIERCE, *supra*, § 9.1 at 559. They are

---

[7] As Mr. Arishi points out, RCW 34.05.482(1)(a) provides that agencies may use brief adjudication only if "[t]he use of those proceedings in the circumstances does not violate any provision of law." The APA has already ruled out unconstitutional proceedings before one reaches RCW 34.05.482(1)(d).

Subsection (1)(d)'s concern with whether issues and interests warrant full adjudication must refer to something different. We construe statutes so that "'all the language used is given effect, with no portion rendered meaningless or superfluous.'" *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003).

much more likely to base the procedure required on controlling regulations or statutes. *See id.* In our case, the controlling statute is the APA.

A key reason the drafters of the Model Act included only a few adjudication options was uniformity and predictability. As they explained, if some variations are not available

> many agencies will either attempt to obtain enactment of statutes to establish procedures specifically designed for such agencies, or proceed "informally" in a manner not spelled out by any statute. . . . [W]ide variations in procedure will occur from one agency to another, and even within a single agency[,] . . . producing complexity for citizens, agency personnel and reviewing courts, as well as for lawyers.

Model Act § 4-201 cmt., 15 U.L.A. at 77. The Model Act's drafters also emphasized, "The number of available procedures in the administrative procedure act should not, however, be so large as to make the act too complicated or to create uncertainty as to which type of procedure is applicable." *Id.*

Our Supreme Court endorsed this reasoning in *Seattle Building & Construction Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 920 P.2d 581 (1996), in which it rejected an agency's argument that it could develop its own, adequate substitute for the types of adjudication authorized under the APA. Several union labor councils and apprenticeship and training committees challenged the Washington State Apprenticeship and Training Council's failure to hold an adjudicatory hearing to consider a contested application for approval of a competing apprenticeship program. The court

held approval of such voluntary applications to be licenses within the meaning of RCW 34.05.010(9)(a), and therefore subject to being "conducted as adjudicative proceedings" by RCW 34.05.422(1)(b). *Seattle Bldg.* at 800 (quoting RCW 34.05.422(1)(b). Although the statute does not state what type of adjudicative proceeding is required, the court held that the APA required the presumptive full adjudication. *Id.* at 804.

The court rejected the Apprenticeship Council's argument that deference was due its interpretation that full adjudication was not required, observing that deference to agency interpretation of a statute is appropriate when a statute is ambiguous and "the agency is charged with its administration and enforcement." *Id.* at 799. The myriad state agencies that are *subject to* the APA are not charged with its administration and enforcement.

The court also rejected the applicant's argument that the Apprenticeship Council had a long history of regulation not requiring adjudicative hearings, and had demonstrated that its existing system of program approval was adequate. The court responded:

> The APA does not allow discretion to forego required formal adjudicatory proceedings on the ground that another system is alleged to be adequate.

*Id.* at 803. It continued:

> Appellants were deprived of significant procedural safeguards available in formal adjudicatory proceedings, including testimony taken under oath, the opportunity for structured cross-examination, and an agency order containing requisite findings, conclusions, and the reasons therefor. Absent

27

compliance with these and other procedural requirements, judicial review of the merits of agency action is significantly hampered and may even be effectively foreclosed. This matter must be remanded for a formal adjudicatory hearing.

*Id.* at 804 (citations omitted).

The APA is clear. Except as provided by RCW 34.05.410(1)(a) through (1)(c)—and statutory brief adjudication is the only conceivable exception that could apply to the hearing Mr. Arishi challenges[8]—adjudicative proceedings are governed by the provisions describing full adjudication.

### IV. Brief adjudication was an inadequate process given the issue and interests in Mr. Arishi's case

Brief adjudication "requires only that the agency inform the party of the agency's view on the matter, give the party an opportunity to explain his or her view, and give the party a statement of reasons for the agency decision." Andersen, *supra*, at 818-19; RCW 34.05.485.

The issue in Mr. Arishi's case pitted his version of events against the version of events charged by Whitman County. Only two people had firsthand knowledge of the Arishi-MOS dealings—Mr. Arishi and MOS—and neither of them was personally known to members of the conduct board or to any witness who testified. Because assessment of

---

[8] "Emergency" action was taken against Mr. Arishi by WSU initially; he does not challenge that proceeding.

28

veracity and credibility were key, safeguards of the subpoena power, oral testimony, and cross-examination were critical.

In this connection, WSU argues that MOS could not have been compelled to appear at the hearing. It cites to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1688, and to guidance from the Office for Civil Rights. Br. of Resp't at 28. We are unpersuaded by WSU that Title IX applied to its investigation or charges in this case. MOS was not only *not* a student at WSU, she was not a student at any federally-funded school. She was being homeschooled. Nor did any of the conduct that was the basis for WSU's charges take place on WSU property.

As to interests, the charges presented the risk of severe hardship of several sorts. Mr. Arishi faced the risk of losing his financial and personal investment in three years of doctoral education, a semester before its anticipated completion. His lawyer's representation that he would not be able to complete the program elsewhere is credible. *See* James M. Picozi, Note, *University Disciplinary Process: What's Fair, What's Due, and What You Don't Get*, 96 YALE L.J. 2132, 2138 (1987) ("The most significant alteration of an expelled student's status, though, is his inability to re-enroll at another university. A subsequent university to which a student may apply *always* knows of the reasons for his prior dismissal. . . . If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in 'good standing.'").

29

He faced the damage to his personal reputation from a finding that he had committed what amounts to class C felonies. RCW 9A.44.079 (rape of a child in the third degree), 9A.44.089 (child molestation in the third degree). He faced the loss of his visa and his ability to remain legally in the United States, a right that the United States Supreme Court has recognized may be more important to a person than even a potential jail sentence. *Padilla v. Kentucky*, 559 U.S. 356, 368, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).

Given these issues and interests, the statutory brief adjudication process would not have been adequate. *Cf. Liu v. Portland State Univ.*, 281 Or. App. 294, 300, ____ P.3d ____ (2016) (Under Oregon's administrative procedure act, charges against student required trial type contested case procedures because the type of hearing was "substantially of the character that would necessitate [such] procedures" as provided by former Or. Rev. Stat. § 351.088 (2011)).

*V. Mr. Arishi was prejudiced by invalid agency action*

Finally, even having demonstrated invalid agency action, Mr. Arishi must show substantial prejudice from the action complained of. RCW 34.05.570(1)(d). No Washington decision has identified the appropriate test for prejudice in this context.

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court considered which standard of prejudice was appropriately applied when a criminal defendant claimed to have been denied effective

30

representation of counsel. It rejected the high standard required for newly-discovered evidence, because a motion seeking to present new evidence "presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged." *Id.* at 694. By contrast, "[a]n ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard should be somewhat lower." *Id.* In such a case, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

The Court in *Strickland* likened ineffective assistance of counsel to cases where exculpatory information is not disclosed to the defense by the prosecution, and where testimony is unavailable to the defense because of government deportation of a witness—all situations where a crucial assurance of a reliable outcome is absent. It found the proper standard for prejudice in such cases to be the same: a defendant must show that there is a *reasonable probability* that, but for the problematic representation or prosecution, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

We find that the same considerations apply where invalid agency action deprives a party of a crucial assurance of a reliable outcome. We hold that the *Strickland* standard is

31

the appropriate standard to determine prejudice when the issues and interests warrant full adjudication and the agency fails to afford it.

In assessing prejudice, we do not compare full adjudication with statutory brief adjudication; instead, we compare the process the agency actually provided with full adjudication. (Accordingly, where an agency provides more process than statutory brief adjudication, it might avoid reversal in some cases, by preventing prejudice.) Mr. Arishi must show a reasonable probability that had he been provided with all of the rights and safeguards available in full adjudication, the result of the proceeding would have been different.

Mr. Arishi makes that showing, demonstrating a probability sufficient to undermine confidence in the outcome. He contends he would have subpoenaed MOS. Perhaps she would have been credible. But the fact that MOS did not testify and was never cross-examined undermines confidence in the outcome. This is particularly so in light of evidence undermining her credibility: she misrepresented her age on Badoo as 19, misrepresented "Alex's" age to her mother, was going out during the daytime when she was supposed to be doing homework at home, was driving illegally, and had a different version of events when interviewed by Sergeant Chapman than she did when interviewed twice by Detective Dow. Mr. Arishi also contends that, in and of itself, the opportunity for the conduct board to see MOS would have supported his defense that he reasonably believed she was 19.

32

The denial of representation by counsel also undermines confidence in the result. Had Mr. Arishi been represented, his lawyer could have alerted the conduct board to the problem with relying on testimony about Sergeant Chapman's and Detective Dow's opinions. Entirely apart from the fact that the opinions were presented through hearsay (hearsay can be admitted in full adjudications), "Obvious opinions on credibility . . . are barred by Rule 608, and the point is beyond debate. Obvious opinions on credibility have seldom been considered by Washington's appellate courts because there is nothing that can be argued on appeal to make them admissible." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 608.16, at 458 (6th ed. 2016). A police officer's "purported 'expert' opinion[]" that a witness is truthful is no exception. *State v. Wilber*, 55 Wn. App. 294, 299, 777 P.2d 36 (1989).

Mr. Arishi is therefore entitled to relief.

### *VI. Attorney fees*

Mr. Arishi requests an award of costs and reasonable attorney fees on appeal under the "Equal Access to Justice Act" (EAJA), RCW 4.84.340-.360. Under RAP 18.1(a), a party may recover attorney fees on appeal if authorized by applicable law.

Under the EAJA, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). No challenge is raised to Mr.

33

Arishi's status as a qualified party. But WSU argues that even if his appeal is successful he has not yet prevailed, and, alternatively, that its position was substantially justified.

Because RCW 4.84.350(1) provides that "[a] qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought," a party can prevail for purposes of the EAJA even where an administrative proceeding is remanded and the successful appellant might not prevail on the ultimate merits. In *Kettle Range Conservation Group. v. Department of Natural Resources*, for example, an environmental organization was deemed to be the prevailing party on a significant issue because the environmental review that would continue following remand would be based on corrected sediment analysis that could be materially more protective of the environment. 120 Wn. App. 434, 469, 85 P.3d 894, 912 (2003). Similarly, in *Alpine Lakes Protection Society v. Department of Natural Resources*, an environmental group was found to have prevailed on a significant issue because it successfully challenged a mitigated determination of nonsignificance on the basis that probable future forest practices must be considered by the agency, even though the case was remanded for further fact-finding as to whether an environmental impact statement would be required. 102 Wn. App. 1, 18-19, 979 P.2d 929 (1999). *But cf. Ryan v. Dep't of Soc. & Health Servs.*, 171 Wn. App. 454, 476, 287 P.3d 629 (2012) (relying on case law involving fee statutes other than the EAJA).

34

In this case, Mr. Arishi has established that he is entitled to a full adjudicative hearing, a significant issue that achieves the benefit he sought. He has thereby prevailed for purposes of the EAJA.

The question that remains is whether WSU's action was substantially justified. "Substantially justified" means justified to a degree that would satisfy a reasonable person. *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007). An action is substantially justified if it had a reasonable basis in law and in fact. *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 832, 306 P.3d 920, 933-34 (2013). It need not be correct, only reasonable. *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 566 n.2, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988)).

We do not find WSU's action to have been substantially justified. Mr. Arishi made a statute-based challenge and emphasized that he was not claiming to have been denied due process. Yet WSU responded by focusing exclusively on case law involving constitutional challenges. It never examined whether the APA permits agencies to adopt a hybrid process falling somewhere between brief and full adjudication—a process that might meet constitutional muster, but is in disregard of the fact that the APA does not authorize agencies to "forego required formal adjudicatory proceedings on the grounds that another system is alleged to be adequate." *Seattle Bldg.*, 129 Wn.2d at 803. We award Mr. Arishi reasonable attorney fees on appeal subject to his timely compliance with RAP 18.1(d).

CONCLUSION

We recognize that for institutions that have not conducted full adjudications in the past, are subject to Title IX, and receive a complaint of sexual misconduct amounting to a felony under criminal law, our decision will require them to develop the capacity to conduct a timely full adjudication. We recognize this is not a simple matter, especially for small institutions, but the issue and interests demand as much for students like Mr. Arishi.

We point out that many Washington agencies avoid some of the demands of conducting full adjudications themselves by using, as the presiding officer, an administrative law judge assigned by the office of administrative hearings in accordance with chapter 34.12 RCW. In his 1989 article on the APA, Professor Andersen points out that institutions of higher education obtained an exemption from the obligation to use independent administrative law judges in 1988, an exemption whose wisdom he questioned and that he hoped would be corrected. Andersen, *supra*, at 810 n.172, 817 n.220 (citing RCW 34.05.425(2)). Institutions of higher education might want to request legislative reconsideration of that exemption, at least as it applies to disciplinary actions that require full adjudication. If, working with colleges and universities, the office of administrative hearings is able to conduct an adjudication in compliance with Title IX requirements, it will relieve educational institutions of that burden and provide independence that could be valuable in these difficult cases.

36

No. 33306-0-III
*Arishi v. Wash. State Univ.*

We reverse the superior court and the underlying agency order, award Mr. Arishi

reasonable attorney fees, and remand for a full adjudication.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell. J.

37

### APPENDIX

Eight Washington institutions follow the "conference adjudication" approach of the Model Act by limiting brief adjudication to categories of relatively inconsequential sanctions. Three provide for brief adjudication in all student conduct proceedings, but limit brief adjudication to appeals from those proceedings that involve a sanction no more serious than a suspension of 10 instructional days.[9] One limits brief adjudication to student conduct cases in which the proposed penalty is less than dismissal.[10] Another provides that a student is entitled to a "formal" adjudication of any dismissal decision upon request, and that the institution's vice-president can also choose to conduct a "formal" hearing.[11] The state's largest institution of higher education, the University of Washington, makes a "formal" adjudication available to students accused of hazing; students subject to a recommended sanction of dismissal, suspension, or restitution in excess of $300 dollars; and students accused of sexual misconduct in which any sanction is imposed by the conduct officer to whom the allegation is initially referred. WAC 478-120-100(3); 478-120-137(2).

Five institutions have not adopted brief adjudication for any student conduct

---

[9] WAC 132A-125-050(8) (Peninsula College); WAC 132J-126-280(1) (Green River College); WAC 495D-121-360(9) (Lake Washington Institute of Technology).
[10] WAC 132U-108-020(3) (Whatcom Community College).
[11] WAC 495E-120-130(4) (Renton Technical College).

proceeding, yet appear from other regulations to conduct proceedings that fall short of the requirements for full adjudication.[12] Evidently they have overlooked the requirement of RCW 34.05.482(1)(c) that brief adjudication can be used only when the agency has adopted that process by rule. (Many institutions also appear to have overlooked the requirement of RCW 34.05.250 that in adopting a rule of procedure that differs from the chief administrative law judge's model rules, an agency shall include in the order of adoption a finding, stating the reasons for the variance.)

Twenty institutions, using what appears to be pattern language, adopt brief adjudication for all student conduct proceedings and include no provision under which a full adjudication will ever be available to a student.[13]

---

[12] Yakima Valley Community College, *see* Title 132P WAC; Walla Walla Community College, *see* Title 132T WAC; Tacoma Community College, *see* Title 132V WAC; South Puget Sound Community College, *see* WAC 132X-90-040 and Title 132X WAC); and Evergreen State College (WAC 174-135-010; chapter 174-123 WAC).

[13] WAC 106-08-050(3) (Central Washington University); WAC 132B-108-050(3) (Grays Harbor College); WAC 132D-108-050(3) (Skagit Valley College); WAC 132E-108-050(3) (Everett Community College); WAC 132G-108-050(3) (Shoreline Community College); WAC 132H-108-450(3) (Bellevue Community College); WAC 132I-108-050(1)(b) (Highline College); WAC 132L-108-050(3) (Centralia College); WAC 132M-108-020[(3)][(c)] (Lower Columbia College); WAC 132Q-108-050(3) (Spokane Community College; Spokane Falls Community College); WAC 132R-02-050(3) (Big Bend Community College); WAC 132S-01-050(3) (Columbia Basin College); WAC 132W-09-050 (Wenatchee Valley College); WAC 132Y-108-050(3) (Edmonds Community College); WAC 132Z-108-050(3) (Cascadia Community College); WAC 495A-108-050(3) (Bates Technical College); WAC 495B-108-050(3) (Bellingham Technical College); and WAC 495C-108-050(3) (Clover Park Technical College), and *see* Title 516 WAC (Western Washington University).

There are several outliers from these three common approaches, one being WSU,

with its adoption of brief adjudication for all student conduct matters, subject to review

and conversion to full adjudication after-the-fact.[14]

---

[14] Others are Pierce College, which adopts brief adjudication for review of tuition and fee waivers and makes brief adjudication optional for a student facing a disciplinary proceeding. WAC 132K-130-010(b); 132K-125-330. Clark College, Olympic College and Seattle Community Colleges adopt brief adjudication for "[a]ppeals from actions from student conduct or disciplinary hearings" but not the student conduct proceedings themselves. WAC 132N-108-020(3); WAC 132C-120-102(8); WAC 132F-108-050(8). Eastern Washington University permits students to apply for "formal" adjudication and anomalously provides for brief adjudication "[w]hen required by law or constitutional right." WAC 172-108-040, -050.